RENDERED:  AUGUST 7, 2026; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-1025-ME

WASTE SERVICES OF THE
BLUEGRASS, LLC                                                    APPELLANT


APPEAL FROM SCOTT CIRCUIT COURT
v.        HONORABLE KATHRYN H. GABHART, JUDGE
ACTION NO. 19-CI-00351


WILLIAM COPE; LINDA STACY;                              APPELLEES
AND MARK WALLACE


OPINION
AFFIRMING

** ** ** ** **

BEFORE:  THOMPSON, CHIEF JUDGE; ECKERLE AND MOYNAHAN,
JUDGES.

MOYNAHAN, JUDGE:  This appeal arises from a Scott Circuit Court order[1]

certifying a class in an action against Waste Services of the Bluegrass, LLC

---

[1] Despite its interlocutory nature, we have jurisdiction to review this appeal.  *See* Kentucky Rules
of Civil Procedure ("CR") 23.06.

("WSB") alleging nuisance, negligence, and negligence *per se*[2] in WSB's operation of the Central Kentucky Landfill ("Landfill"). Plaintiffs and members of the proposed class are residents of the area surrounding the Landfill. For the reasons set forth below, we affirm.

## BACKGROUND

WSB operated the Landfill, a 102-acre solid-waste facility located in northern Scott County near Sadieville, in the years prior to its closure in 2022. The facility included a 14-acre Construction and Demolition Debris ("CDD") landfill which ceased operations on or around December 9, 2016, pursuant to an Agreed Order with the Kentucky Energy and Environment Cabinet ("EEC"). Comprising another 32.8 acres was a Municipal Solid Waste ("MSW") landfill which continued operations until 2022, at which point it stopped accepting waste pursuant to another Agreed Order with the EEC.

A mix of residential and agricultural properties surround the Landfill. The area to the north and east consists of primarily rural single-family homes and small farms. The Veterans Memorial Wildlife Management Area sits to the south. U.S. Route 25 and Interstate 75 run less than a mile to the west. Nearby

---

[2] For the sake of brevity, and due to the overlap in the class certification analysis of these claims, we address only nuisance, as that theory presents the most likely difficulty. *See also Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 217 (3d Cir. 2020) (holding that Pennsylvania homeowners impacted by noxious odors from a nearby landfill stated valid tort claims for public nuisance, private nuisance, and negligence).

developments include Northern Elementary School, located one mile to the west, and two residential subdivisions, Mallard Point and Harbor Village, located approximately 3.2 and 3.3 miles away, respectively.

For most of its lifespan, the Landfill operated with minimal odor complaints. In the entire year of 2016, the EEC recorded only two odor complaints. However, this trend would not continue. In 2017, the year following the CDD landfill's closure, odor-related complaints steadily increased. By the latter half of that year, the EEC was receiving multiple complaints a week. In 2018 the complaints were near daily. This pattern persisted until the MSW landfill ceased operations in 2022. Complaints submitted during this period detailed specific odors allegedly emanating from the Landfill. A number of these complaints indicated that the severity of the odor impacted their daily routines and ability to participate in outdoor activities. In some instances, the odor even impacted individuals while indoors.

Between 2017 and 2022, the EEC's Division for Air Quality conducted at least 104 inspections of the Landfill and the surrounding area. Inspectors reported odor exceeding regulatory thresholds on 42 of those occasions, resulting in the issuance of Notices of Violation ("NOV") to the Landfill. Each NOV included a directive for corrective action.

## STANDARD OF REVIEW

A circuit court's determination as to when and whether to certify a class is reviewed for an abuse of discretion. *Hensley v. Haynes Trucking, LLC*, 549 S.W.3d 430, 444 (Ky. 2018). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). When making discretionary rulings, a trial court is afforded the flexibility to choose from a realm of choices and "appellate courts are 'powerless to disturb such rulings' that fall within that realm even if the appellate court would make a different choice." *Neb. All. Realty Co. v. Brewer*, 529 S.W.3d 307, 311 (Ky. App. 2017) (quoting *Miller v. Eldridge*, 146 S.W.3d 909, 917 (Ky. 2004)). "As long as the [trial] court's reasoning stays within the parameters of [CR] 23's requirements for certification of a class, the [trial court's] decision will not be disturbed." *Hensley*, 549 S.W.3d at 444 (alterations in original).

## ANALYSIS

The parties raise three matters for our review. WSB contends that the circuit court erred both in granting class certification and in doing so after a significant delay. Appellee, for its part, requests that we strike portions of WSB's

-4-

brief for alleged violations of RAP[3] 32(A)(4).  We consider briefing deficiencies first, then turn to the matter of class certification and its timeliness.

## A. Compliance with RAP 32(A)(4).

Appellee contends that WSB's failure to strictly adhere to RAP 32(A)(4) renders only their timeliness objection under CR 23.03(1) and the portion of their argument relating to proposed class definition properly preserved.  RAP 32(A)(4) states in relevant part that an appellant's brief must contain "a *statement* with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner."  (Emphasis added.)  In its Reply Brief, WSB argues that its response brief with the court below outlined and preserved its various arguments against class certification.  We find that WSB's Reply Brief has satisfactorily remedied any initial briefing error, but caution counsel that full and comprehensive compliance with all appellate rules is expected.

## B. Class Certification Analysis.

Class certification in Kentucky falls under CR 23, which is modeled after its federal counterpart, Federal Rules of Civil Procedure 23.  Therefore, federal law should be consulted in the analysis of a trial court's class action

---

[3] Rules of Appellate Procedure.

determination.  *Hensley*, 549 S.W.3d at 436 n.4 (quoting *Curtis Green & Clay Green, Inc. v. Clark*, 318 S.W.3d 98, 105 (Ky. App. 2010)).

Pursuant to CR 23, a party seeking class certification must establish the four prerequisites laid out in 23.01, and at least one ground enumerated in 23.02.  The party seeking certification bears the burden of proof.  *Manning v. Liberty Tire Servs. of Ohio*, 577 S.W.3d 102, 110 (Ky. App. 2019) (citation omitted).  Compliance with the Rule must be affirmatively demonstrated; that is, plaintiff "must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."  *Brewer*, 529 S.W.3d at 316 (emphasis in original).

### 1.  *No Error in Finding CR 23.01 Prerequisites Satisfied.*

"The four requirements in CR 23.01 to maintaining a class action can be summed up as numerosity, commonality, typicality, and adequacy of representation requirements."  *Manning*, 577 S.W.3d at 111 (quoting *Hensley*, 549 S.W.3d at 442-43) (emphasis omitted).  Of these prerequisites, only two areas challenged by WSB merit discussion:  commonality and typicality.  WSB also contends that the class definition is overbroad and arbitrary.  We begin with the matter of class definition and then address commonality and typicality.

### i. *Class Definition is Administratively Feasible.*

Although some federal courts have adopted an additional threshold

consideration relating to the proposed class definition,[4] the Sixth Circuit has

neither expressly adopted nor rejected this approach.[5] *Burkhead*, 250 F.R.D. at

292 (citing *Olden v. LaFarge Corp.*, 383 F.3d 495 (6th Cir. 2004)). While

Kentucky state courts have occasionally referenced the same concept,[6] our

---

[4] The extent to which courts consider this additional factor varies, even among federal courts in Kentucky. For example, several decisions have relied on the same language – "[a]lthough not specifically mentioned in [Rule 23], the definition of the class is an essential prerequisite to maintaining a class action," *Burkhead v. Louisville Gas & Elec. Co.*, 250 F.R.D. 287, 291 (W.D. Ky. 2008) – but have not applied it uniformly. In *Burkhead*, that language prompted a detailed examination of evidentiary concerns and the causal connection between the defendant's conduct and the proposed geographic boundaries of the class. *Id.* at 291-94. By contrast, in *Powell v. Tosh*, the same language was treated solely as an administrative-feasibility inquiry, despite the presence of similar geographic boundaries in the proposed class definition. 280 F.R.D. 296, 311 (W.D. Ky. 2012). Even in cases applying a more demanding version of this inquiry, however, Kentucky federal courts generally use it only to inform their evaluation of the Rule 23.01 prerequisites, rather than as a separate, determinative criterion. *Burkhead*, 250 F.R.D. at 294; *see also Brockman v. Barton Brands, Ltd.*, No. 3:06CV–332–H, 2007 WL 4162920, at *4 (W.D. Ky. Nov. 21, 2007).

[5] The Sixth Circuit typically only addresses class definition as it relates to administrative feasibility, when it allegedly forms a "fail-safe" class, or when parties seek to modify the class. *See generally Randleman v. Fidelity Nat. Title Ins. Co.*, 646 F.3d 347, 352-53 (6th Cir. 2011) (fail-safe class definitions are an independent ground to deny a class); *Powers v. Hamilton County Public Defender Comm'n*, 501 F.3d 592, 618 (6th Cir. 2007) (court modifies class definition as overbroad because in a suit against public defenders the class definition included individuals who were not represented by public defenders).

[6] Kentucky state courts apply an even more limited version of the class definition inquiry, referencing it solely in connection with administrative feasibility or omitting it altogether. *See, e.g.*, *Manning v. Liberty Tire Servs. of Ohio*, 577 S.W.3d 102, 110-11 (Ky. App. 2019) (treating class definition as an administrative inquiry); *cf. Summit Medical Group, Inc. v. Coleman*, 599 S.W.3d 445 (Ky. App. 2019) (not addressing class definition at all). In most contexts, the only reason class definition is addressed is to determine whether it is an impermissible fail-safe class. *See, e.g.*, *AT&T Corp. v. Feltner*, No. 2023-CA-0051-ME, 2023 WL 6522337, at *2-3 (Ky. App. Oct. 6, 2023); *St. Stephen's Cemetery Ass'n v. Seaton*, No. 2022-CA-0080-ME, 2022 WL

Supreme Court has similarly not addressed the weight to be given to class definition.[7] Accordingly, while we discuss the factor for completeness, we note that it is not required by CR 23.01 and address it in a limited capacity with emphasis on administrative feasibility.[8]

To that end, "[b]efore a court may certify a class pursuant to [CR] 23, the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Manning*, 577 S.W.3d at 110 (alterations in original). (internal quotation marks and citations omitted). A class definition is sufficiently definite when it "identifies exactly who is and is not included in the class and provides the trial court with initial guidance as to how [the] lawsuit is to proceed." *Hensley*, 549 S.W.3d at 449. In environmental tort contexts, courts have recognized that, "[d]efining a class utilizing geographic boundaries is acceptable

_____

16842445, at *4-5 (Ky. App. Nov. 10, 2022); *Sullivan Univ. Sys., Inc. v. McCann*, No. 2020-CA-000118-ME, 2020 WL 5587316, at *2 (Ky. App. Sep. 18, 2020).

[7] In *Hensley*, class definition was discussed because it was attacked as "unmanageable." 549 S.W.3d at 448. The Court seemingly responded by relating class definition back to the mandatory prongs of CR 23.01 rather than viewing it as an element of its own. It then addressed whether the proposed class was an impermissible fail-safe class, as that argument had also been raised.

[8] Outside of the fail-safe analysis, administrative feasibility emerges as the only point of overlap between state and federal approaches, and even then, Kentucky courts have addressed it only sporadically. In our analysis, federal courts that have addressed similar factual circumstances remain persuasive, though the most analytical weight will be found in those areas where Kentucky courts have clearly incorporated federal doctrine.

and appropriate provided there is an evidentiary relationship between the geographic boundaries of the proposed class definition and the alleged exposure zone." *Manning*, 577 S.W.3d at 112 (internal quotation marks and citation omitted).

WSB argues that the class definition is overly broad and arbitrary for several reasons. Those objections fall into two general categories: (1) challenges to the shape or scope of the boundary and who it includes,[9] and (2) challenges based on the absence of environmental modeling or expert analysis. WSB also contends that the trial court failed to adequately address these objections in its certification order. The circuit court certified the following class:

> All persons who have owned or occupied any real property located in whole or in part within four miles of any part of the Central Kentucky Landfill at any time between November 1, 2017 and March 31, 2022, excluding (1) the Defendant, its agents, subsidiaries, and affiliates; (2) the presiding Judge and immediate family, (3) government entities; (4) optouts, (5) those with claims previously adjudicated or released, and (6) counsel of record.

Here, the geographic boundaries are sufficiently definite. The language provides the court with clear initial guidance in identifying who is and is

---

[9] WSB asserts that the four-mile boundary is unjustified, pointing to the fact that the original complaint alleged a five-mile radius. According to WSB, the proposed boundary excludes individuals outside the boundary who also experienced odors. WSB further speculates that there *may* be some individuals within the boundary that did not experience odors at all, though no such individuals have been identified. Finally, WSB asserts that "persons who have owned or occupied" captures legal entities and businesses. This final contention will be addressed more fully later in the Opinion.

not included in the class. *See Hensley*, 549 S.W.3d at 449. The combination of geographic and temporal limitations further simplifies class membership. Moreover, there is some evidentiary relationship between the boundary and the alleged zone of harm. Numerous citizen complaints span the class period and encompass the class area. There is also an abundance of odor NOVs issued by the EEC spanning the duration of the class period. While some individuals outside the boundary may have experienced the odor, any class definition requires drawing a line. Some individuals with valid claims may be excluded from the class. Classes, by nature, will include both those entitled to relief and those not. The fact that some outside the four-mile zone have experienced odors does not undermine the evidentiary basis for the defined area.

Having established that the scope of the class is sufficiently definite, we now address WSB's contention that expert evidence is necessary to link the Landfill to the alleged odor exposure. In this instance, we find that argument unpersuasive.[10] Here, we are persuaded that the NOVs issued by the EEC sufficiently established Landfill as the source of the odor, obviating the need for Appellee to do so independently. Moreover, unlike in cases involving multiple potential emitters, there are no other facilities in the immediate vicinity here that

---

[10] Given a different set of facts – for example, where multiple facilities in the immediate vicinity were capable of creating a similar nuisance – expert evidence might be necessary even at this preliminary stage to establish the scope of a class.

-10-

could cast doubt on the Landfill being the sole source of the smell. *See Olden*, 383 F.3d at 508 (treating the defendant's plant as the sole source of the emissions for class-wide purposes once evidence distinguished its emissions from those of nearby industrial facilities).

Additionally, this case primarily concerns nuisance. Nuisance turns on whether there has been a substantial and unreasonable interference with the use and enjoyment of land – a standard incorporating both objective and subjective components. Unlike cases involving chemical contamination or bodily injury, the existence and scope of the alleged interference here – *e.g.*, persistent odors – are matters capable of ordinary perception and common proof. Indeed, we find no precedent requiring scientific expert testimony to prove nuisance. While the degree of impact may ultimately vary among residents, that question is distinct from whether the class itself can be defined without resort to expert testimony.

WSB relies on several federal cases to assert that expert evidence is required for the class definition to be appropriate. However, those decisions arise in materially distinguishable factual circumstances. Aside from cases involving multiple emitters, many of the cases cited by WSB arise in the context of environmental torts or include claims for personal injury, both of which typically depend on technical, expert-driven evidence to establish contamination levels, exposure pathways, or medical causation. *See, e.g.*, *Cox v. Am. Synthetic Rubber*

*Co.*, No. 3:06-CV-422-H, 2008 WL 5381909 (W.D. Ky. Dec. 17, 2008) (chemical-exposure nuisance claims); *Duffin v. Exelon Corp.*, No. CIV A 06 C 1382, 2007 WL 845336 (N.D. Ill. Mar. 19, 2007) (tritium-release case); *Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58 (S.D. Ohio 1991) (radioactive and hazardous-waste exposure); *Daigle v. Shell Oil Co.*, 133 F.R.D. 600, 602–03 (D. Colo. 1990) (personal-injury claims from toxic-waste pond).

*Powell*, a federal case, represents an analogous precedent. There, the only expert evidence that carried weight was that which directly linked the hog operation to the odor complaints. *Powell v. Tosh*, 280 F.R.D. 296, 305-06 (W.D. Ky. 2012). This is underscored by the court's decision to exclude from the certified class those putative members whose claims depended entirely on expert-driven wind modeling, separating them from the core group supported by more direct, non-speculative evidence of odor exposure. *Id.* In other words, *Powell* treated source attribution, not dispersion modeling, as the critical inquiry. No such attribution problem exists in this case. Not only is the Landfill the only plausible source of the complained-of odors based on the record evidence, there is abundant evidence from the EEC that the Landfill was indeed emitting odor beyond what is allowable.

As we previously explained, a trial court has broad authority to modify or amend a class certification order and class certification itself does not

guarantee that all class members will recover on every claim. *See S. Cent. Bank v. Johnson*, No. 2023-CA-1171-ME, 2024 WL 3381384 (Ky. App. Jul. 12, 2024). This flexibility allows the court to manage proceedings in a manner tailored to the needs of the litigation. There is little reason to doubt the trial court's ability to manage the class it has defined. The circuit court is free to amend the order to define the classes more narrowly, create subclasses, or even dismiss the action entirely as litigation progresses. We see no need to disturb certification at this time.

To the extent that WSB contends the circuit court erred by improperly shifting the burden to WSB, we do not accept this argument. The observation of the court that WSB did not present evidence to support its position does not undermine that Appellee carried its burden. A trial court may note the absence of contrary evidence without relieving the moving party of its obligation to satisfy CR 23.01; it simply reflects that, in the absence of competing proof, the court faces fewer obstacles in concluding that the burden has been met. As the forthcoming discussion will demonstrate, the circuit court did not err in concluding that Appellee satisfied its burden.

### ii. There are Questions Common to the Class (Commonality).

One of the prerequisites to maintaining a class is that there are questions of law or fact common to the class, often referred to as commonality.

-13-

CR 23.01(b). It is not necessary to have a "complete identity of facts relating to all [class] members as long as there is a common nucleus of operative facts." *Manning*, 577 S.W.3d at 113 (quoting *Wiley v. Atkins*, 48 S.W.3d 20, 23 (Ky. 2001)). Even a single common question will do. *Id.* (citation omitted). Here, commonality is clearly satisfied.

In finding commonality satisfied, the Court in *Manning* observed that, "[a]lthough individual damages and issues exist, [the defendants'] conduct allegedly giving rise to liability is identical for each plaintiff and class member." 577 S.W.3d at 114. There, the proposed class consisted of residents affected by Appellees' negligent operation of a recycling facility, which resulted in a fire and particulate fallout onto neighboring properties. The Court identified common questions including whether the defendants owed and breached a duty of care and whether their failure to follow state regulations caused or contributed to the fire. *Id.*

Similarly, the class here consists of residents affected by WSB's operation of the Landfill, which allegedly emitted noisome odors interfering with the use and enjoyment of nearby properties. The central liability question—whether WSB's operation of the Landfill caused noxious odors constituting a nuisance—is common to all class members. While the instant case concerns a course of conduct over a substantial, defined period in contrast to the single mass

-14-

tort event in *Manning*, we find the reasoning transferable. In both cases, liability may be determined on a class-wide basis because the same course of conduct gives rise to similar types of harm. *See id.*

WSB's contention that commonality is defeated by the presence of individualized inquiries is not persuasive. The focus of our analysis "is whether the defendant's conduct was common as to all of the class members." *Sullivan Univ. Sys., Inc.*, 2020 WL 5587316, at \*5 (quoting *Brewer*, 529 S.W.3d at 312 (internal quotation marks and citation omitted)).[11] While it is true that not every class member will have a compensable injury, that is a question of degree. The significance of such individualized issues is more properly addressed in the predominance analysis, discussed below. The common questions of law and fact have been properly identified in satisfaction of the requirement. The circuit court did not err in finding the commonality prerequisite satisfied.

### iii. *Representatives' Claims are Typical of the Class (Typicality).*

"A plaintiff's claim is 'typical' if it 'arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *Manning*, 577 S.W.3d at 114 (quoting *In re Skelaxin (Metaxalone) Antitrust Litig.*, 299 F.R.D.

---

[11] We cite to this and other unpublished cases as well as to federal cases throughout this Opinion, for their persuasive value on issues involving class certification. *See* RAP 41.

-15-

555, 575 (E.D. Tenn. 2014) (citation omitted)). "A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members." *Id.* (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1082 (6th Cir. 1996)). The fact that "individual members of the class still will be required to submit evidence concerning their particularized damage claims in subsequent proceedings" does not defeat the typicality element. *Id.* at 115 (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)); *Burkhead*, 250 F.R.D. at 296 (individualized damages are not an impediment to certification).

WSB's argument that typicality fails because the class definition may encompass legal entities or businesses is unpersuasive. Courts evaluating typicality in nuisance class actions have not drawn a meaningful distinction between natural persons and legal entities, nor have they suggested that a human class representative must only represent human persons. In this case, the only difference of consequence between human persons and legal entities is one of damages. Both entities otherwise make a similar claim of nuisance based on the same course of conduct. A class may be properly maintained when the harm suffered differs in degree, as long as it is of the same type. *Burkhead*, 250 F.R.D. at 295 (citing *Boggs*, 141 F.R.D. at 65). Unlike *Modern Holdings*, the named

Plaintiffs here are not alleging personal injury—an inquiry that is without question highly individualized both factually and legally. *Mod. Holdings, LLC v. Corning, Inc.*, No. 5:13-cv-00405-GFVT, 2018 WL 1546355, at *1 (E.D. Ky. Mar. 29, 2018). The issues here are not so individualized as to defeat typicality.

WSB's reliance on *Burkhead* does not alter this conclusion. *Burkhead* involved multiple facilities in the area, creating uncertainty as to the source of the alleged nuisance and resulting in significant variations in factual and legal issues. 250 F.R.D. at 295-96. That uncertainty is not present here. Here, as in *Boggs* and *Olden*, the record reflects that the noxious orders are attributable to WSB. There are no other facilities in, nor immediately outside of, the class area that could be causing the odor. Changes in elevation or wind direction are less compelling at the certification stage when there is only one bothersome industry in the class area. Indeed, *Burkhead* itself acknowledges that "typicality concerns are significantly reduced where a court can be assured that whatever tort occurred (if any) was potentially the result of the named defendant's activities." *Id.* (alterations in original). We are not persuaded that the named Plaintiffs are so differently positioned that their claims are not typical of potential class members in the furthest reaches of the class.

The relevant inquiry is whether the named Plaintiffs allege injury arising from the same course of conduct *or* assert the same legal theory as the other

class members. *Manning*, 577 S.W.3d at 114. That is precisely the situation here. To the extent any subclassing becomes appropriate to address differing damages models, CR 23.03 provides the trial court with ample flexibility. *See, e.g.*, *Childers Oil Co. v. Reynolds*, No. 2011-CA-001352-ME, 2012 WL 1900135, at *2 (Ky. App. May 25, 2012). The circuit court did not err in finding the named Plaintiffs' claims typical of the class.

### 2. *No Error in Finding CR 23.02(c) Requirements Satisfied.*

After satisfying the prerequisites laid out in CR 23.01, a proposed class must also qualify under at least one of the three categories of class actions described in CR 23.02. While CR 23.01 ensures that the case possesses the basic structural features necessary for representative litigation, CR 23.02 requires the court to determine whether proceeding as a class action is appropriate in light of the nature of the claims and the practical realities of adjudication. In this case, the circuit court certified the liability-only class under CR 23.02(c), which authorizes certification when:

> the court finds that the questions of law or fact common to the members of the class **predominate** over any questions affecting only individual members, and that a class action is **superior** to other available methods for the fair and efficient adjudication of the controversy.

CR 23.02(c) (emphasis added). The rule identifies several considerations relevant to this inquiry:

-18-

> (i) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (iv) the difficulties likely to be encountered in the management of a class action.

*Id.* These factors reflect the twin demands of predominance and superiority, each of which are addressed in turn.

### i. *Common Questions Predominate.*

The predominance inquiry asks whether the proposed class is cohesive enough to justify resolving the claims collectively. *Manning*, 577 S.W.3d at 116. CR 23.02(c) "requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Manning*, 577 S.W.3d at 116 (quoting *Hensley*, 549 S.W.3d at 437) (internal quotation marks and citations omitted). In practical terms, this requires the court to identify the outcome-determinative substantive issues, assess which of those issues will predominate, and determine whether they are common to the class. *Id.* (citing *Bell Atl. Corp. v. AT & T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003)). "In other words, the predominance element is lacking where issues idiosyncratic to the claims of individual class members would detract from the benefit of a conglomerate approach." *Id.*

WSB's predominance argument largely repackages the arguments advanced in challenging commonality. WSB again contends that liability cannot be resolved on a class-wide basis because it turns on a series of individualized, property-specific, factual determinations. WSB further contends that separating liability from damages does nothing to cure this defect as the individualized questions permeate the liability analysis and therefore prevent the case from being tried on a common basis. Accordingly, we must examine the elements of a typical nuisance action and identify which issues are dispositive.

Stemming from the common law, the General Assembly codified nuisance and defined it as occurring when "a defendant's use of property causes unreasonable and substantial annoyance to the occupants of the claimant's property or unreasonably interferes with the use and enjoyment of such property[.]" Kentucky Revised Statutes ("KRS") 411.530; KRS 411.540. Kentucky courts have recognized the elusive nature of nuisance as one that depends wholly on the particular facts and circumstances of a case. *Louisville Refin. Co. v. Mudd*, 339 S.W.2d 181, 184 (Ky. 1960). For that reason, precedent cannot accurately determine whether an activity will be a nuisance. *Curry v. Farmers Livestock Mkt.*, 343 S.W.2d 134, 138 (Ky. 1961). KRS 411.550 directs a court to consider the following when determining whether there exists a private nuisance:

(1) In determining whether a defendant's use of property constitutes a private nuisance, the judge or jury, whichever is the trier of fact, shall consider all relevant facts and circumstances including the following:

(a) The lawful nature of the defendant's use of the property;

(b) The manner in which the defendant has used the property;

(c) The importance of the defendant's use of the property to the community;

(d) The influence of the defendant's use of property to the growth and prosperity of the community;

(e) The kind, volume, and duration of the annoyance or interference with the use and enjoyment of claimant's property caused by the defendant's use of property;

(f) The respective situations of the defendant and claimant; and

(g) The character of the area in which the defendant's property is located, including, but not limited to, all applicable statutes, laws, or regulations.

(2) A defendant's use of property shall be considered as a substantial annoyance or interference with the use and enjoyment of a claimant's property if it would substantially annoy or interfere with the use and enjoyment of property **by a person of ordinary health and normal sensitivities**.

KRS 411.550 (emphasis added).  While it is true that there are subjective components to nuisance as it inherently implicates aspects of human perception, KRS 411.550 filters this experience through an objective benchmark.

As explained in *Rockwell International Corp. v. Wilhite*, 143 S.W.3d 604, 627 (Ky. App. 2003), "in Kentucky, nuisance is primarily concerned with some use of property by a defendant which causes sufficient annoyance to an adjacent property possessor that interferes with the use of the adjacent land. . . ." The Kentucky Supreme Court explained that the fact finder should consider the following:

> [T]wo broad factors, neither of which may in any case be the sole test to the exclusion of the other:  (1) the **reasonableness** of the defendant's use of his property, and (2) the **gravity of harm** to the complainant.  Both are to be considered in the light of all the circumstances of the case, including the lawful nature and location of the defendant's business, the manner of its operation, and such importance to the community as it may have; the kind, volume, time and duration of the particular annoyance; the respective situations of the parties; and the character (including applicable zoning) of the locality.  The extreme limits are therefore, on the one hand, the reasonable use causing unreasonable damage and, on the other hand, the unreasonable (or negligent) use causing damage that is more unnecessary than severe.

*Louisville Refin. Co. v. Mudd*, 339 S.W.2d 181, 186-87 (Ky. 1960) (emphasis added).[12] Although Kentucky applies a balancing test in determining whether a nuisance exists, the *defendant's* conduct and the context in which the activity occurs are often central to the analysis because they directly inform whether the use of the property is reasonable under the circumstances. *See also* KRS 411.550. Under Kentucky's objective standard for evaluating harm and its context-driven inquiry into the reasonableness of the defendant's activity, a liability-only nuisance determination turns on common, defendant-focused evidence rather than individualized issues. The analysis centers on the character of the interference and the nature of the defendant's conduct, leaving plaintiff-specific variations with no predominating role at this stage.

This does not change in a class action context. "Class-wide issues predominate if resolution of some of the legal or factual questions for class-wide resolution can be achieved using **generalized proof**, and if these particular issues are more substantial than those requiring individualized proof." *Manning*, 577 S.W.3d at 116 (citing *Thacker v. Chesapeake Appalachia, L.L.C.*, 259 F.R.D. 262, 268 (E.D. Ky. 2009)) (emphasis added). To be sure, predominance does not require the absence of individualized issues; it requires only that the common

_____

[12] KRS 411.570 states that nuisance legislation should be "ancillary" and "supplemental" to the common law, and "not be construed as repealing any of the statutes or common law of the Commonwealth relating to nuisance."

issues outweigh them. *St. Stephen's Cemetery Association v. Seaton*, No. 2022-CA-0080-ME, 2022 WL 16842445, at *11 (Ky. App. Nov. 10, 2022) (quoting 2 WILLIAM B. RUBENSTEIN, NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 4:54 (6th ed. 2022)).  Whether common issues predominate must be analyzed considering the particular facts and circumstances of each case. *Id.* at *11 (citing *Daye v. Cmty. Fin. Serv. Ctrs., LLC*, 313 F.R.D. 147, 166 (D.N.M. 2016)).

In the past several years, we have presided over a small number of class action certifications having to do with some environmental encroachment on parties' use and enjoyment of their property.  In *Vance v. White-Turner/Kokosing Joint Venture*, construction of an Amazon distribution center required blasting. No. 2021-CA-1394-ME, 2022 WL 3329459, at *1 (Ky. App. Aug. 12, 2022).[13]  A proposed class of residential property owners within a one-mile radius of the construction project sued, claiming that the blasting constituted a temporary nuisance. *Id.*  Importantly, the blasting took place in various locations over a two-year period and Vance alleged many types of injuries:  excessive vibrations, loud noises, personal items moving or falling, cracks in surfaces, sinking foundations, separation of porches, dust, and family pets being disturbed. *Id.* at *3.  Applying *Manning*, an isolated event alleging only two injuries, we found that a lack of uniformity in causation and injury emphasized the "glaring" need for

_____

[13] RAP 41.  We cite to this case persuasively.

-24-

individualized proof such that the predominance requirement was not satisfied. *Id.* at \*3-4.

Manning and *Vance* are distinguishable from the instant case. Both cases involve some kind of physical damage to the property, emphasizing the need for property-specific findings. In *Manning* the concern was particulate matter – where it came from, whether it actually landed on the plaintiff's property, and whether the plaintiff was within the plume of smoke produced by the instigating fire, were among a few of the questions we identified. *Manning*, 577 S.W.3d at 117. In *Vance*, the blasts uniquely damaged each property. 2022 WL 3329459, at \*3. Here, property-specific determinations are not central to the claim. Appellee straightforwardly asserts loss of use and enjoyment caused by negligent operation of the Landfill by WSB. Although the proposed class covers a multi-year timespan, there is less concern for individualized issues where there is an alleged course of conduct of one facility underlying the claim as opposed to discrete blasts in various locations. While we acknowledge the point made in *Vance* that the degree of interference does involve *some* individualized inquiry into the unique circumstances of each property, we believe that it does not preclude a liability-only finding of nuisance which can be resolved using generalized proof.

*Bell v. DuPont Dow Elastomers, LLC*, 640 F. Supp. 2d 890 (W.D. Ky. 2009), supports this determination. There, residents within a two-mile radius of a

neighboring chemical manufacturing facility filed a class action seeking damages

for nuisance, among other claims. *Id.* at 893. The facility allegedly emitted

noxious odors and other airborne contaminants during its life cycle but was

beginning to permanently shut down its operations by the time residents filed suit.

*Id.* The court found that common issues of fact and law predominated over

individual issues. *Id.* at 895. It reasoned that the odors and contamination would

affect plaintiffs and their properties in similar ways under the law, and that each

face the same difficulties in proving their case. *Id.* While Kentucky's Western

United States District Court has denied certification in similar cases, it suggested

that odor-only cases do not face the same evidentiary barriers as cases where there

is physical damage to the property:

> The Court's analysis here is somewhat different from
> *Dickens v. OxyVinyls*, 631 F. Supp. 2d 859 (W.D. Ky.
> 2009), and *Bell v. DuPont*, 640 F. Supp. 2d 890 (W.D.
> Ky. 2009), because of the presence of actual particles,
> and **not just odors**, on Plaintiffs' properties.

*Brockman v. Barton Brands, Ltd.*, No. 3:06CV-332-H, 2009 WL 4252914, at *1

n.2 (W.D. Ky. Nov. 25, 2009).

Even if there was a serious risk of individualized issues

predominating the litigation, bifurcation had satisfactorily remedied that concern.

In support of this conclusion, where there are multiple plaintiffs in alleging

nuisance, Kentucky courts have not historically treated individualized damages or

subjective experience as a barrier to adjudicating the nuisance claim. *See, e.g.,*
*Rockwell Intern. Corp. v. Wilhite*, 143 S.W.3d 604 (Ky. App. 2003) (74 additional
parties named in appeal sued for property damage due to polychlorinated biphenyls
exposure); *City of Monticello v. Rankin*, 521 S.W.2d 79 (Ky. 1975) (appellees were
property owners and residents of an area near a sewage treatment plant); *C. Rice*
*Packing Co. v. Ballinger*, 311 Ky. 38 (1949) (seven appellees, including the city of
Covington); *Wheat Culvert Co. v. Jenkins*, 246 Ky. 319 (1932) (appellees reside
adjacent and close to metal manufacturing plant). Moreover, a Kentucky court, on
at least one occasion, has bifurcated a nuisance action into separate liability and
damages phases, reflecting the longstanding recognition that these inquiries are
analytically distinct and may be tried independently when appropriate. *Chick, Co-*
*Trustee of Patricia L. Chick Living Trust Dated July 18, 2001 v. Bohnert*, No.
2023-CA-1352-MR, 2024 WL 4862949 (Nov. 22, 2024).[14]

This history reflects a consistent judicial understanding that
*liability* turns on an objective, common question: whether the complained activity
would substantially annoy or interfere with the use and enjoyment of property for a
person of ordinary health and normal sensitivities. Thus, in contexts where the

---

[14] Federal courts also occasionally employ bifurcation to resolve the issue of individualized damage determinations. *See, e.g., Brockman*, 2007 WL 4162920, at *9 (courts often bifurcate class action proceedings, leaving the issue of damages to be decided separately).

nuisance is uniformly experienced by proposed class members, the existence of a nuisance is a common question capable of class-wide resolution.

The statutory scheme itself reinforces the appropriateness of bifurcation: a condition is first determined to be a nuisance, and *thereby* the statute provides that the nuisance reduces the value of a property. *See* KRS 411.530; KRS 411.540. Moreover, courts have long recognized that such property-based damages may be determined through uniform valuation methodologies, including formulaic or mass-appraisal approaches, without requiring individualized adjudication of each plaintiff's subjective experience. *See, e.g.*, *Sterling*, 855 F.2d at 1212; *Olden*, 383 F.3d at 510. This structure confirms that bifurcation is not only doctrinally sound under Kentucky nuisance law but also fully consistent with the statute's framework.

In this specific factual scenario, where there is only one possible source of emission and plaintiffs only complain of noxious odors, we are satisfied that common issues of law and fact predominate this liability-only class. The questions presented largely center WSB's conduct at the liability stage and are capable of resolution using generalized proof. Moreover, bifurcation appropriately alleviates any concerns raised by the presence of individualized issues. We cannot say the circuit court abused its discretion in certifying the class as it did.

### ii. *Class Action is the Superior Method of Adjudication.*

Pursuant to CR 23.02(c), in addition to finding that common issues of law and fact predominate, class action must be the superior method of adjudication. The purpose of a class action is to promote judicial economy. Therefore, to determine whether a class action is the superior method, a court must consider the four factors elucidated in CR 23.02(c). In essence this requires a court to examine "the difficulties of managing a class action, compare other means of disposing of the suit, and the value of individual damage awards because smaller awards weigh in favor of class suits." *Childers*, 2012 WL 1900135, at *6 (citing *Beattie v. Century Tel, Inc.*, 511 F.3d 554, 567 (6th Cir. 2007)).

Due to the relatively low individual damages and high cost of litigation, few individuals would possess a rational interest in prosecuting their claims separately. The facts of this case are essentially identical for every Plaintiff for the purposes of liability. In the interest of avoiding repetitive proceedings and inconsistent results, class action is the superior method of adjudication. The circuit court considered the difficulties in managing the class and determined the class to be sufficiently ascertainable through public records, leases, and other documentation. The court also reserved the right to revisit manageability as necessary. Consistent with the above findings, the circuit court did not err in finding that class action is the superior method of adjudication

### 3. *The Trial Court Undertook a Rigorous Analysis.*

In determining whether to certify a class, the trial court must undertake a "rigorous analysis." *Hensley*, 549 S.W.3d at 445-46. WSB alleges that the circuit court failed to conduct such an analysis. The record does not support that claim. Whether an analysis is sufficiently rigorous turns largely on the court's procedures and the adequacy of its findings. An analysis is sufficiently rigorous when the court has developed a meaningful record and engaged with the evidence, even if the written order was brief. *Id.* at 446 (trial court conducted extensive hearings and reviewed voluminous testimony and exhibits despite limited written findings); *see also S. Cent. Bank*, 2024 WL 3381384, at *13-14 (trial court order identified evidence and applied relevant precedent to its discussion of each CR 23 prerequisite). In contrast, rigor is lacking where the order makes no findings of fact or conclusions of law, contains no discussion of the CR 23.01 prerequisites, and fails to make findings consistent with its relevant CR 23.02 subsection. *See United Propane Gas, Inc. v. Purcell*, 533 S.W.3d 199, 203 (Ky. App. 2017).

We believe the record supports a determination that the circuit court did conduct a rigorous analysis. The court's order shows it carefully engaged with each element of CR 23 and provided reasoning supporting each of its findings. The record is well-developed, containing voluminous complaints about the

Landfill and each NOV issued by the EEC. In consideration of the above, we are satisfied that the circuit court undertook a "rigorous analysis" and decided the matter within the bounds of its learned discretion. Consequently, we find no abuse of discretion by the circuit court in its grant of class certification.

## C. Timeliness of Motion for Class Certification under CR 23.03(1).

The thrust of WSB's argument is the five-year delay of *Appellee* in moving to certify the class. CR 23.03(1) states in relevant part, "[a]t an early practicable time after a person sues or is sued as a class representative, *the court must determine by order whether to certify the action as a class action.*" (Emphasis added.) The original complaint was filed May 3, 2019. Appellee moved to certify the class on November 12, 2024. The parties completed their memorandum filings in February of 2025. The circuit court entered its order on July 30, 2025.

While it is true that litigation in this case has progressed slowly, we perceive no error in the circuit court's delay. *See Gardener v. GEICO Gen. Ins. Co.*, No. 2022-CA-0306-ME, 2023 WL 3398188, at *3 (Ky. App. May 12, 2023) (holding that a four-year delay between motion and decision did not constitute an abuse of discretion).[15] As litigation had been dormant for a considerable period,

---

[15] We note the parallels between *Gardner* and the present case, including that both actions were pending through the early period of the COVID-19 pandemic and generated substantial records. A key distinction, however, is that the motion to certify in *Gardner* was filed in 2018 and remained pending until 2022. *Id.* at *2. Conversely, here the motion to certify was not filed until well after the initial complaint.

there was no practical reason for the court to address class certification any earlier than when it was prompted to do so.

Moreover, the initial complaint filed in 2019 was clearly captioned "Class Action Complaint." Thus, WSB was on notice of the nature of the claims being pursued from the outset. Under these circumstances, Appellee cannot complain of delay when it could have petitioned the court to address class certification at any earlier point. "While [the circuit court's determination] is typically done after the named representative moves for class certification, there is no requirement in the Civil Rules which requires the named representative to move for certification." *Summit Med. Grp. Inc., v. Coleman*, No. 2021-CA-0804-ME, 2022 WL 1697800, at *6 (Ky. App. May 27, 2022) (citation omitted). "In order to avoid any prejudice to themselves, the defendants were free to petition the court on the issue of certification." *Boring v. Medusa Portland Cement Co.*, 63 F.R.D. 78, 80 (M.D. Pa. 1974); *see also Summit,* 2022 WL 1697800, at *2, 6 (class certification issue raised by defendant).

## CONCLUSION

Because the circuit court did not abuse its discretion by certifying a liability-only class, we AFFIRM.


ALL CONCUR.


-32-

BRIEFS FOR APPELLANT:                    BRIEF FOR APPELLEES:

Judd R. Uhl                              Randal A. Strobo
R. Morgan Salisbury                      Clay A. Barkley
Lexington, Kentucky                      Timothy J. Mayer
                                         Louisville, Kentucky

                                         Donald R. Todd
                                         Lexington, Kentucky